# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 30, 2012

No. 11-20547

Lyle W. Cayce
Clerk

BP EXPLORATION LIBYA LIMITED,

Plaintiff - Appellee

v.

EXXONMOBIL LIBYA LIMITED,

Defendant - Appellee

v.

NOBLE NORTH AFRICA LIMITED,

Defendant - Appellant

Appeals from the United States District Court
for the Southern District of Texas

Before JOLLY, DeMOSS, and STEWART, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

BP Exploration Libya Limited ("BP"), ExxonMobil Libya Limited ("Exxon"), and Noble North Africa Limited ("Noble") are entangled in a disagreement over the appointment of arbitrators to hear and decide their dispute related to the alleged breach of an assignment agreement. The case arises from an underlying dispute implicating the interests of these three parties, under an agreement to arbitrate that seems designed for a two-party

No. 11-20547

dispute. Notwithstanding that the parties agreed to arbitrate before three arbitrators, the district court, in an effort to fit the arbitration agreement to the dispute at hand, ordered the parties to proceed to arbitration before five arbitrators: three party-appointed arbitrators, who then would choose two neutral arbitrators. If the party-appointed arbitrators could not agree, the district court ordered the parties to petition the Secretary-General of the Permanent Court at The Hague (the "PCA") for appointment of the two neutral arbitrators. Now on appeal, we hold that there was a lapse in the naming of arbitrators in the parties' agreement, that the district court was authorized to exercise appointment power under 9 U.S.C. § 5, and that the district court erred in deviating from the parties' express agreement to arbitrate before a three-member panel. Accordingly, we AFFIRM in part, VACATE the district court's judgment, and REMAND for further proceedings, not inconsistent with this opinion.

I.

A.

On March 31, 2009, Noble and Exxon entered into and executed a Drilling Services Agreement ("Drilling Agreement"). Noble agreed to provide offshore drilling contractor services to Exxon, specifically the use of Noble's semi-submersible drilling rig, the *Noble Homer Ferrington* (the "Rig"), to drill certain deepwater oil wells for Exxon in the waters off of Libya. On March 3, 2010, Exxon and BP entered into an Assignment Agreement, wherein Exxon agreed to assign, and BP agreed to assume, the Drilling Agreement for the time necessary for BP to drill two deepwater oil wells in those Libyan waters. The Assignment Agreement required Noble, who consented to the assignment, to maintain the Rig according to the safety and operational standards provided in the Drilling Agreement. Under the terms of the Assignment Agreement, BP

No. 11-20547

agreed to take possession of the Rig and assume Exxon's obligations no later than June 1, 2010.

In anticipation of acceptance, BP conducted an inspection of the Rig in late April 2010. BP found several problems that implicated the Drilling Agreement's safety and operational requirements. BP orally and in writing informed Exxon of its concerns and requested that Exxon address the problems to BP's satisfaction before BP accepted assignment of the Rig and Drilling Agreement. Noble also was informed of the problems in a detailed report. Although Exxon initially agreed with BP that the Rig was "not ready to perform in accordance with the drilling contract and with good oilfield practices," it eventually took the position, after Noble had received certain parts for the Rig, that the Rig was assigned to BP effective June 30, 2010.

BP conducted additional inspections of the Rig that summer, but remained unsatisfied with the Rig's condition and so informed Exxon after the final inspection in late July. Exxon responded on August 2, informing BP that it should continue working with Noble to resolve the issues, consistent with the Rig's assignment to BP as of June 30, 2010. That same day, Exxon informed Noble by letter that BP was responsible for paying Noble for its services from June 30, 2010 until the end of the Assignment Period. In response, BP informed Exxon that Noble should not send invoices to BP because assignment of the Rig had yet to occur, and until BP was satisfied that the Rig complied with the Drilling Agreement's requirements, BP disclaimed any contractual relationship with Noble. By subsequent letter dated August 16, 2010, BP informed Exxon and Noble that, because the two parties had materially breached the Assignment Agreement, it was exercising its right to terminate the agreement. BP's letter, moreover, disclaimed any obligation to pay either party under the agreement.

The Drilling Agreement and Assignment Agreement contain arbitration provisions that govern any disputes arising out of the respective agreements.

No. 11-20547

But the Assignment Agreement's arbitration provision, found in Section 33, contemplated two different arbitration scenarios: arbitration over a dispute between Exxon and BP; and arbitration over any dispute to which Noble was a party.  Specifically, in the Assignment Agreement, the parties agreed:

> Any difference arising out of or in connection with the terms of the Assignment Agreement (regardless of the nature of the question or dispute) shall as far as possible be settled amicably.  Failing an amicable settlement within (3) three months of the written notification by one party to the other of a difference, or such longer period as the parties may agree, any dispute or difference arising out of [sic] relating to this Assignment Agreement shall be referred to arbitration before three (3) arbitrators in accordance with the International Arbitration Rules of the American Arbitration Association.  Each Party shall appoint one (1) arbitrator.  The two (2) arbitrators so appointed shall appoint the third arbitrator, who shall chair the arbitral tribunal. . . .

> For avoidance of doubt, the parties agree that the dispute resolution mechanism in this section 3[3] shall apply *only* to disputes between [Exxon] and [BP] and that any disputes to which [Noble] is a party shall be governed by the *language contained in Sections 18.1 and 18.2 of the [Drilling] Agreement* which are incorporated by reference herein and made a part hereof for such purpose as though set out in full herein.

Section 18.1 of the Drilling Agreement simply provides that the "General Maritime Law of the United States" shall govern the validity of the Drilling Agreement and all matters pertaining thereto.  We are concerned, for purposes of this appeal, with Section 18.2 of the Drilling Agreement, which states in relevant part:  "Any dispute arising out of, or in connection with, this contract shall be finally settled by arbitration under the rules of the Arbitration and Conciliation Act 1990, by three (3) arbitrators appointed in accordance with such rules . . . ."  Thus, for any dispute to which Noble was a party arising out of the Assignment Agreement, BP and Exxon and Noble agreed to arbitrate before

No. 11-20547

three arbitrators appointed in accordance with the rules of the Arbitration and Conciliation Act 1990 ("ACA").

Incorporated as part of the Laws of the Federation of Nigeria, the ACA is based on the 1985 UNCITRAL[1] Model Law on International Commercial Arbitration, and the 1976 UNCITRAL Arbitration Rules ("1976 UNCITRAL Rules"). The ACA consists of four Parts and three Schedules. Part I relates to arbitration, in general; Part II relates to conciliation; Part III contains additional provisions relating to international commercial arbitration and conciliation; and Part IV contains miscellaneous provisions. Schedule 1 to the ACA contains the "Arbitration Rules" (hereinafter, the "ACA Rules"), which are, for the most part, similar to Parts I and III of the ACA. Because Section 18.2 refers to the "rules" of the ACA, the provisions related to arbitrator appointment found in the ACA Rules, not the ACA itself, control our analysis.[2] In the event of a conflict between the ACA and ACA Rules, however, the provisions of the ACA control.

The procedure to appoint arbitrators where the parties' arbitration agreement calls for three arbitrators is found in Articles 7(1)-(3) of the ACA Rules. Article 7(1) states: "If three arbitrators are to be appointed, each party shall appoint one arbitrator; and the two arbitrators thus appointed shall choose the third arbitrator." Once the first party has appointed its arbitrator, the respondent party has thirty days to appoint its arbitrator; the two arbitrators then have thirty days to appoint the third arbitrator. "If within thirty days after

---

[1] UNCITRAL is the United Nations Commission on International Trade Law. Established by the United Nations General Assembly in 1966, UNCITRAL plays an important role in developing and improving a legal framework to facilitate international trade and investment. *See* The UNCITRAL Guide, Basic Facts about the United Nations Commission on International Trade Law 1 (2007), http://www.uncitral.org/pdf/english/texts/general/06-50941_Ebook.pdf.

[2] In their briefs to this court and in the court below, the parties refer to the ACA Rules and ACA sections related to arbitrator appointment interchangeably. Although the differences between the relevant provisions are, for the most part, minimal, the plain language of Section 18.2 compels this court to analyze the ACA Rules.

the receipt of a party's notification of the appointment of an arbitrator the other party has not notified the first party of the arbitrator he has appointed," Article 7(2) states that "the first party may request the court to appoint the second arbitrator." And, "[i]f within thirty days after the appointment of the second arbitrator the two arbitrators have not agreed on the choice of the presiding arbitrator," then Article 7(3) states that "the presiding arbitrator shall be appointed by the court in the same way as a sole arbitrator would be appointed under Article 6."[3] For purposes of Article 7, the ACA defines "court" as "the High Court of a State, the High Court of a Federal Capital Territory, Abuja or the Federal High Court." The ACA, however, as alluded to above, has similar sections related to arbitrator appointment, the main substantive difference being that, if an arbitrator is to be appointed, the "appointing authority," instead of the "court," shall appoint the necessary arbitrator(s) to comprise the tripartite panel. "[A]ppointing authority" is defined as the "Secretary-General of the Permanent Court of Arbitral at The Hague."

## B.

With Exxon taking the position that BP was responsible for paying Noble under the terms of the Assignment Agreement and BP disclaiming any such obligation, Noble was left with no party paying the rate to which it believed it was entitled under the agreements. Accordingly, on August 27, 2010, as "a

---

[3] Article 6 provides a procedure to appoint a sole arbitrator. Essentially, if the parties cannot agree on the appointment of a sole arbitrator, then the court shall appoint the arbitrator as promptly as possible using a list-procedure, unless the parties agree otherwise or the court determines in its discretion that a list-procedure is inappropriate for the case. The list procedure requires the court to communicate to both parties an identical list of three names. The parties then have fifteen days to delete any arbitrator(s) to which he objects and preference the remaining names. The ACA Rules then direct the court to appoint the sole arbitrator from among the names approved on the lists and in accordance with the order of preference indicated by the parties. If for any reason the appointment cannot be made according to this procedure, the ACA Rules allow the court to exercise its discretion in appointing the sole arbitrator.

party" to a dispute arising out of the Assignment Agreement, Noble served an arbitration demand on BP and Exxon, maintaining that one or both of them was responsible for payment and seeking damages related to their alleged breach of the agreements.  By its notice of demand, Noble also designated its arbitrator, Daryl Bristow, in accordance with Article 7(1) of the ACA Rules.

Almost immediately, BP and Exxon, as co-respondents to Noble's demand, realized the arbitrator appointment procedure set forth in Article 7 appeared unworkable for a dispute among three parties.  The respondent party is to select the second arbitrator under Article 7(1)–would that fall to Exxon, BP, or both; if both BP and Exxon designated an arbitrator, then there would be three arbitrators, but no neutral arbitrator to preside over the panel.  Resisting any suggestion of joint appointment of the second arbitrator, BP and Exxon began negotiating with Noble to reach agreement on an alternative selection procedure. Noble, for some unknown reason, decided not to petition the "court" or "appointing authority" for appointment of the second arbitrator under Article 7(2), but that appears irrelevant as BP and Exxon disavowed any idea that they should be considered one "party" under Article 7 and were determined to appoint their own arbitrators to represent their interests on any arbitral panel.

On October 22, 2010, however, during a point where negotiations appeared to have irretrievably broken down, BP filed suit in federal district court in Houston, Texas under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 (the "New York Convention"), 21 U.S.T. 2517, 330 U.N.T.S, as implemented by the FAA, 9 U.S.C. §§ 201, *et seq.*,[4]

---

[4] BP Exploration Libya Limited is a company incorporated under the laws of England and Wales, with its principal place of business in England.  Exxon Mobil Libya Limited is a company incorporated under the laws of the Bahamas.  Noble North Africa Limited is a company organized under the laws of the Cayman Islands.  Consequently, the parties' arbitration agreement embodied by Section 33 of the Assignment Agreement and Section 18.2 of the Drilling Agreement is an agreement among those who are not all citizens of the United States, and is in a maritime transaction.  The New York Convention, ratified by the parties'

No. 11-20547

seeking judicial intervention in the parties' arbitrator appointment process pursuant to 9 U.S.C. § 5. Section 5 directs the district court to follow any method provided in the agreement for naming or appointing an arbitrator(s) or umpire, but

> if no method be provided therein, or if a method be provided and any party thereto shall fail to avail himself of such method, or if for any other reason there shall be a lapse in the naming of an arbitrator or arbitrators or umpire, or in filling a vacancy, then upon the application of either party to the controversy the court shall designate and appoint an arbitrator or arbitrators or umpire, as the case may require, who shall act under the said agreement with the same force and effect as if he or they had been specifically named therein; and unless otherwise provided in the agreement the arbitration shall be by a single arbitrator.

9 U.S.C. § 5. Reserving all rights and objections to the arbitrator appointment procedure specified in the ACA Rules, BP also designated its arbitrator, David Caron. In November, Exxon designated its arbitrator, the Honorable Robert M. Parker. The parties continued to negotiate, but by early January 2011, BP concluded settlement was improbable and proceeded with its suit.

Exxon answered BP's Complaint in January 2011, agreeing with BP that a lapse had occurred in the appointment process and that judicial intervention was required. Noble disagreed and filed a Motion to Dismiss or, in the Alternative, Request for Relief Under the FAA ("Motion to Dismiss"), in which it argued that BP's complaint should be dismissed for failure to state a claim upon which relief may be granted because there had been no lapse in the process of arbitrator appointment provided in the parties' arbitration agreement. If the district court disagreed, Noble alternatively argued that the court should enforce the terms of the parties' arbitration agreement and order joint appointment of

---

nations, therefore applies to the parties' arbitration agreement. As a result, the district court had original subject matter jurisdiction over BP's action under 9 U.S.C. §§ 202, 203.

the second arbitrator by Exxon and BP; in the event they could not agree, Noble urged the district court to appoint the second arbitrator.

Soon thereafter, BP filed its Motion for a Final Order Under the Federal Arbitration Act ("Motion for Final Order), requesting that the district court intervene under § 5, dismiss the three arbitrators the parties had appointed, and order the parties to select arbitrators under a different procedure. BP proposed four alternative procedures: (1) order that the parties exchange lists of suitable arbitrators, from which each party would exercise a certain number of strikes before the court selected a panel from the remaining names; (2) order an appointing authority, such as the PCA, to select the entire panel; (3) order the parties to proceed to arbitration before a five-member panel, comprised of the three party-appointed arbitrators, who would choose two other arbitrators; or (4) order the parties to arbitrate before a three-member panel selected by the district court.

Exxon urged the district court to appoint as the panel the three arbitrators the parties had designated already, a solution Exxon viewed as efficient and in accord with Section 18.2's explicit requirement of three arbitrators.

Without holding oral argument, the district court on May 20, 2011, granted BP's Motion for Final Order, in which it ordered

> that the three arbitrators previously appointed by the parties shall unanimously select two neutral arbitrators and the arbitration shall proceed with a panel of five arbitrators. If they are unable to unanimously agree within thirty (30) days, the Secretary-General of the PCA shall appoint the two remaining arbitrators for this dispute.

Shortly thereafter, BP presciently informed the PCA that its assistance may be required for appointment purposes, and indeed, the three party-appointed arbitrators failed to agree on the selection of two neutral arbitrators by June 20, 2011. That same day, Noble appealed from the district court's order of May 20.

No. 11-20547

Thereafter, on July 1, 2011, the district court denied as moot Noble's Motion to Dismiss because "the Court's Order granting [BP's Motion for Final Order] resolved the underlying disagreement giving rise to [Noble's Motion to Dismiss]." On July 5, Noble filed an amended notice of appeal. The district court, on motion of Noble, later stayed its order of May 20 pending appeal.

Noble argues on appeal that the district court erred in denying its Motion to Dismiss because the court lacked authority to intervene under 9 U.S.C. § 5 and the issue of arbitrator selection is a procedural issue presumptively for an arbitrator to decide. If the district court did have authority under 9 U.S.C. § 5, Noble contends the court nevertheless erred in ordering arbitration before a five-member arbitral panel where the parties agreed to arbitrate before a three-member panel, and in refusing to order Exxon and BP to appoint jointly the second arbitrator.

## II.

Although no party objects to this court exercising appellate jurisdiction over Noble's appeal from the district court's orders granting BP's Motion for Final Order and denying Noble's Motion to Dismiss, we have both the inherent authority and continuing obligation to determine our jurisdiction before rendering a decision on the merits. *Brown v. Pacific Life Ins. Co.*, 462 F.3d 384, 390 (5th Cir. 2006). The FAA provides that "[a]n appeal may be taken from . . . a final decision with respect to an arbitration that is subject to this title." 9 U.S.C. § 16(a)(3); *see also Amgen, Inc. v. Kidney Ctr. of Delaware Cnty., Ltd.*, 95 F.3d 562, 565 (7th Cir. 1996) ("[Section] 16 also includes a provision that affects orders issued under the FAA when the arbitration has nothing to do with any litigation."). "Section 16(a)(3) [ ] preserves immediate appeal of any 'final decision with respect to an arbitration,' regardless of whether the decision is favorable or hostile to arbitration." *Green Tree Fin. Corp. v. Randolph*, 531 U.S. 79, 86 (2000). The FAA does not define the term "final decision," but the

No. 11-20547

Supreme Court has held the term should be afforded the "well-developed and longstanding meaning" in 28 U.S.C. § 1291–that is, a decision that "'ends the litigation on the merits and leaves nothing more for the court to do but execute the judgment.'" *Id.* (quoting *Catlin v. United States*, 324 U.S. 229, 233 (1945)); *see also Brown*, 462 F.3d at 391 (same); *Gulf Guar. Life Ins. Co. v. Conn. Gen. Life Ins. Co.*, 304 F.3d 476, 482 (5th Cir. 2002) (same). And although "[t]he FAA [ ] permit[s] parties to arbitration agreements to bring a separate proceeding in a district court to enter judgment on an arbitration award once it is made (or to vacate or modify it), [ ] the existence of that remedy does not vitiate the finality of the [d]istrict [c]ourt's resolution" of a "final decision with respect to an arbitration." *Id.*

In this case, no party challenges the notion that their underlying dispute is subject to binding arbitration per the agreements. Put another way, the parties are not litigating any issues in their contract dispute in the district court. The sole relief sought in BP's Complaint, and in its later Motion for Final Order, was judicial intervention under 9 U.S.C. §§ 5 and 16(a)(3) to resolve the parties' impasse over the selection of arbitrators. By intervening under § 5 and ordering a new appointment process, the district court granted to BP the sole relief sought in its Complaint and Motion for Final Order. The district court's order therefore ended the litigation on the merits and is a "final order with respect to an arbitration" under 9 U.S.C. § 16(a)(3), over which we exercise jurisdiction to review. *See Brown*, 462 F.3d at 391 ("In this case, the district court granted the sole remedy sought by the plaintiffs in the Federal Actions–an order compelling arbitration."); *Stop & Shop Supermarket Co. LLC v. United Food & Commercial Workers Union Local 342*, 246 F. App'x 7, 9-10 (2d Cir. 2007) (reviewing merits of district court order under § 5 appointing replacement arbitrator where plaintiff filed action in federal district court requesting judicial intervention to determine appropriate arbitrator under parties' agreement); *Nat'l Am. Ins. Co.*

11

*v. Transamerica Occidental Life Ins. Co.*, 328 F.3d 462, 464-66 (8th Cir. 2003) (reviewing merits of district court order appointing replacement arbitrator where plaintiff filed suit in federal district court under 9 U.S.C. § 5 seeking only a court-appointed replacement after arbitrator resigned during the arbitral proceedings); *Amgen,* 95 F.3d at 567 (holding that district court order under 9 U.S.C. § 7 issuing a summons and compelling compliance with the summons to aid ongoing arbitral proceedings was appealable under § 16(a)(3) as a "final decision" because the order "disposed of all the issues before [the district court], and [the order] provided the sole relief requested, even though [the district court] did retain jurisdiction over the case"); *Manze v. State Farm Ins. Co.*, 817 F.2d 1062, 1067 (3d Cir. 1987) (holding that an order appointing a neutral arbitrator is final and appealable under 28 U.S.C. § 1291 where it represents the full relief sought and "will not in the normal course of procedure be followed by another judicial order which will be required to carry the arbitration award into effect" (internal quotation marks and emphasis omitted)); *cf. Saturn Distrib. Corp. v. Paramount Saturn, Ltd.*, 326 F.3d 684, 686 (5th Cir. 2003) (holding that order compelling arbitration, which arose out of independent proceedings, was a "final decision" under *Green Tree*).

The district court's order granting BP's Motion for Final Order, furthermore, resolved the substantive merits of Noble's Motion to Dismiss because the parties' motions raised competing arguments with respect to judicial intervention under § 5.[5] In recognition of this fact, the district court later denied Noble's motion as moot because its previous order "resolved the underlying

---

[5] This point is underscored by the fact that Noble's Response to BP's Motion for Final Order and its Reply to BP's Response to its Motion to Dismiss were contained in the same memorandum.

No. 11-20547

disagreement giving rise to Noble's Motion to Dismiss."[6]  The district court's order granting BP's Motion for Final Order thus, in effect, ended the litigation on the merits, leaving the district court with nothing more to do but execute its judgment.  Accordingly, the district court's order of May 20, which implicitly resolved Noble's Motion to Dismiss on the merits, is a "final decision with respect to an arbitration" under 9 U.S.C. § 16(a)(3), over which we exercise jurisdiction to review.

## III.

Determinations of law, such as the district court's proper interpretation of a statute, are reviewed *de novo.   See Republic of Kazakhstan v. Biedermann Int'l*, 168 F.3d 880, 881 (5th Cir. 1999); *Ranzy v. Tijerina*, 393 F. App'x 174, 175-76 (5th Cir. 2010) (reviewing denial of motion for relief under 9 U.S.C. § 5 *de novo*).  We also review *de novo* the district court's order on a motion to dismiss for failure to state a claim under Rule 12(b)(6).  *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007).

## IV.

## A.

The FAA reflects both a "liberal federal policy favoring arbitration," *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1745 (2011) (internal quotation marks omitted), and the "fundamental principle that arbitration is a matter of contract," *Rent-A-Center, West, Inc. v. Jackson*, 130 S. Ct. 2772, 2776 (2010). The Supreme Court therefore has directed that arbitration agreements be placed on equal footing with other contracts and "enforced according to their terms." *AT&T*

---

[6] If the district court had agreed with Noble that it lacked authority under § 5 to intervene, then it would have granted Noble's motion and denied BP's motion as moot. Instead of contemporaneously denying Noble's Motion to Dismiss as moot at the time it granted BP's Motion for Final Order, the district court, for whatever reason, simply waited until later to enter the order.  This does not change the fact that the district court ended the litigation on the merits by granting BP's Motion for Final Order, requiring the court to deny as moot Noble's Motion to Dismiss.

*Mobility,* 131 S. Ct. at 1748 (internal quotation marks omitted). "It falls to courts and arbitrators to give effect to [] contractual limitations, and when doing so, courts and arbitrators must not lose sight of the purpose of the exercise: to give effect to the intent of the parties." *Stolt-Nielsen S.A. v. Animalfeeds Int'l Corp.*, 130 S. Ct. 1758, 1774-75 (2010).

"Consistent with this statutory scheme of promoting the resolution of commercial disputes through arbitration rather than litigation, the FAA expressly favors the selection of arbitrators by parties rather than courts." *Shell Oil Co. v. CO2 Comm., Inc.*, 589 F.3d 1105, 1109 (10th Cir. 2009). But Congress recognized that judicial intervention may be required in certain circumstances "to 'move the parties to an arbitrable dispute out of the court and into arbitration as quickly and easily as possible.'" *Gulf Guar.*, 304 F.3d at 489 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 22 (1983)). Hence, as part of the "very limited" jurisdiction granted to the courts under the FAA to intervene in the arbitral process before an award, 9 U.S.C. § 5 authorizes a court to intervene "to select an arbitrator upon application of a party," in three instances:  (1) if the arbitration agreement does not provide a method for selecting arbitrators; (2) if the arbitration agreement provides a method for selecting arbitrators but any party to the agreement has failed to follow that method; or (3) if there is "a lapse in the naming of an arbitrator or arbitrators." *Id.* at 486, 490 (internal quotation marks and emphasis omitted). The statute thus illustrates congressional intent to "facilitat[e] arbitration when impasse in selection" of arbitrators has occurred, but "contemplates that the parties must follow the contractual procedure for arbitrator selection if such exists." *Pac. Reins. Mgmt. Corp. v. Ohio Reins. Corp.*, 814 F.2d 1324, 1327 (9th Cir. 1987). Courts will not hesitate to vacate an award if arbitrators are not selected pursuant to the method specified in an arbitration agreement. *Bulko v. Morgan Stanley DW Inc.*, 450 F.3d 622, 625 (5th Cir. 2006) (citing cases where award

vacated when arbitration panel not appointed in accordance with specified method in contract).

The facts of this case do not implicate the first and third bases for judicial intervention under § 5 because the arbitration agreement did provide a method of selecting arbitrators and the parties availed themselves of that method, notwithstanding that method's inherent problems in this case. The parties appear to concede as much, with the crux of their disagreement over whether there was a "lapse in the naming of an arbitrator or arbitrators or umpire." Exxon and BP argue there was a lapse; Noble strongly disagrees.

Noble maintains that the ACA Rules provide a resolution to any lapse in the naming of arbitrators; specifically Article 7(2) provides that the "first party may request the court to appoint the second arbitrator." And for international commercial disputes such as this one, Noble asserts that "the court" in Article 7(2) must be replaced with "appointing authority"–the PCA–in Section 44(6) of the ACA because the provisions conflict with respect to the authority to exercise appointment power. Noble therefore contends that, as a matter of law under § 5, the method provided in the ACA Rules for resolving disputes over appointments must be followed, and the district court lacked authority to act under § 5.

Exxon disagrees with Noble. It argues that there was a lapse in the naming of arbitrators because the method in Article 7 of the ACA Rules suffered a mechanical breakdown that can only be resolved by judicial intervention. Exxon disputes Noble's contention that the ACA Rules furnish a method to resolve the parties' dispute, maintaining that Article 7 is silent with respect to selection of a three-member panel in a dispute with more than two parties. BP agrees with Exxon that the method envisioned in Article 7 is unworkable for a three-party dispute, the consequence being that the parties lack an appropriate

method to select the arbitrators. This has caused, according to BP, a mechanical breakdown or lapse, requiring judicial intervention under § 5.

We agree with Exxon and BP that the arbitrator appointment process specified in Section 18.2 of the Drilling Agreement to which the parties agreed to be bound in Section 33 of the Assignment Agreement has reached a "mechanical breakdown" or lapse, thereby authorizing the district court to intervene under § 5.[7] We define "lapse," for purposes of 9 U.S.C. § 5, to "mean[ ] 'a lapse in time in the naming of the' arbitrator or in the filling of a vacancy on a panel of arbitrators, or some other mechanical breakdown in the arbitrator selection process.'" *In re Salomon Shareholders' Derivative Litig.*, 68 F.3d 554, 560 (2d Cir. 1995) (citing *Pac. Reins.*, 814 F.2d at 1327). In *Pacific Reinsurance*, for example, the Ninth Circuit held that the district court acted within its authority under § 5 in designating an arbitrator, even though seven of the parties' twelve contracts contained an appointment method, where the parties' deadlock over whether that method should apply to the other five contracts resulted in a lapse in the naming of the "umpire" arbitrator. *Pac. Reins.*, 814 F.2d at 1327-28. And in *Stop & Shop Supermarket*, 246 F. App'x at 11, each party to the arbitration agreement had selected an arbitrator, which the other party then refused to recognize as legitimate under the parties' arbitration agreement. The Second Circuit affirmed the district court's appointment of an

---

[7] The "lapse" here in the naming of arbitrators is different from the situation where the arbitration agreement contains a forum selection clause, and subsequent to execution of the parties' arbitration agreement, the forum becomes "unavailable" for some reason. In such a situation, we have held that a district court may not appoint substitute arbitrators and compel arbitration in another forum under 9 U.S.C. § 5, thereby "circumvent[ing] the parties' designation of an exclusive arbitration forum," if "the choice of that forum 'is an integral part of the agreement to arbitrate, rather than an ancillary logistical concern.'" Ranzy v. Tijerina, 393 F. App'x 174, 176 (5th Cir. 2010) (quoting Brown v. ITT Consumer Fin. Corp., 211 F.3d 1217, 1222 (11th Cir. 2000)); Nat'l Iranian Oil Co. v. Ashland Oil, Inc., 817 F.2d 326, 333-34 (5th Cir. 1987); see also In re Salomon Shareholders' Derivative Litig., 68 F.3d 554, 561 (2d Cir. 1995) (same).

arbitrator under § 5 because the parties' deadlock in naming arbitrators resulted in a lapse. *Id.*

The parties in this case too have reached an impenetrable deadlock over the appointment of arbitrators to hear their dispute. BP, Exxon, and Noble agreed to arbitrate any dispute to which Noble was a party arising out of the Assignment Agreement in accordance with Section 18.2 of the Drilling Agreement. That section, in turn, states that the parties shall appoint three arbitrators in accordance with the ACA Rules. Articles 7(1)-(3) of the ACA Rules provide a method to appoint three arbitrators; hence, there is a "method of naming or appointing" the arbitrators. Noble initiated arbitration and appointed its arbitrator pursuant to Article 7(1). The respondent party was to then appoint its arbitrator within thirty days. At this point, the mechanical breakdown in the process occurred. BP and Exxon each appointed an arbitrator in accordance with Article 7, bringing the total to three arbitrators. Those appointments, however, precluded appointment of a neutral arbitrator at the unanimous choosing of the party-appointed arbitrators in accordance with the traditional selection process of a tripartite panel. Even if the party-appointed arbitrators could come to agreement on a neutral arbitrator, such an appointment would bring the arbitral panel to four members, in contravention of Section 18.2's express requirement of three arbitrators. Noble, moreover, refused to recognize BP and Exxon's appointments, taking the position that BP and Exxon should appoint jointly the second arbitrator, a position BP and Exxon steadfastly refused to accept. The parties attempted to resolve the impasse for months, floating numerous ideas to no avail. Absent judicial intervention, the breakdown in the parties' appointment process "might indefinitely delay arbitration proceedings," the exact scenario Congress sought to avoid in enacting § 5 by providing parties recourse to the courts. *Stop & Shop*, 246 F. App'x at 11.

Accordingly, there was a lapse under 9 U.S.C. § 5, authorizing the district court to intervene and exercise appointment power.

Our conclusion that there has been a lapse in the naming of arbitrators under the terms of the parties' arbitration agreement is supported by the general understanding that the 1976 UNCITRAL Rules, upon which the ACA Rules are modeled, do not address how a panel of three arbitrators is to be selected in multi-party disputes. The 1976 UNCITRAL Rules were amended in 2010. During the revision process, the UNCITRAL Working Group noted that "Articles 6 to 8"–which correspond to Article 7 of the ACA Rules–"deal with the appointment of arbitrators, but they do not include provisions dealing with appointment of arbitrators in multi-party cases." UNCITRAL, Working Group II (Arbitration), Forty-fifth Session, Vienna, 11-15 Sept. 2006, U.N. Doc. A/CN.9/WG.II/WP.143 (¶¶45, 47); see also UNCITRAL, Working Group II (Arbitration), Fortieth Session, Vienna, 25 June-12 July 2007, U.N. Doc. A/CN.9/614 (¶62) ("[A]rticles 6 to 8, which dealt with the appointment of arbitrators, did not include provisions dealing with appointment of arbitrators in multiparty cases."). Pursuant to the Working Group's recommendations, the drafters of the 2010 UNCITRAL Rules added Articles 10(1) and 10(3), provisions which are relevant to this case. Article 10(1) provides that "where three arbitrators are to be appointed and there are multiple parties as claimant or as respondent, unless the parties have agreed to another method of appointment of arbitrators, the multiple parties jointly, whether as claimant or respondent, shall appoint an arbitrator." But "in the event of any failure to constitute the arbitral tribunal under these Rules," Article 10(3) states that "the appointing authority shall, at the request of any party, constitute the arbitral tribunal and, in doing so, may revoke any appointment already made and appoint or reappoint

No. 11-20547

each of the arbitrators and designate one of them as the presiding arbitrator."[8]
Notwithstanding Noble's argument to the contrary, these amendments confirm
our conclusion that, in this case, Article 7 of the ACA Rules does not provide a
method to resolve the lapse in the naming of three arbitrators.[9]

Congress sought, in enacting § 5, to cure indefinite delay in arbitration
proceedings based on disagreement over the appointment of arbitrators by
providing parties with access to a neutral forum to correct such failures. *Stop
& Shop*, 246 F. App'x at 11. We hold that, although the parties' agreement
contained a method–Article 7 of the ACA Rules–to select arbitrators, that
method has reached a mechanical breakdown. Thus, there was a lapse in the
naming of arbitrators and any party was permitted to seek the district court's
intervention under § 5. BP exercised that permission and requested the district
court's intervention. The district court had authority to intervene under § 5 and
it did not therefore err in doing so. We hold that the district court properly

---

[8] Although these two provisions appear to point directly to the resolution of this case,
these rules are model rules of the UNCITRAL that have not been incorporated as part of the
ACA; indeed, the 2010 UNCITRAL Rules post-date the ACA Rules by more than twenty years.
Accordingly, they do not control our analysis.

[9] Noble also contends that the district court lacked authority to intervene under 9
U.S.C. § 5 because under *Howsam v. Dean Witter Reynolds*, 537 U.S. 79, 84 (2002), and
*Dockser v. Schartzberg*, 433 F.3d 421 (4th Cir. 2006), procedural questions–such as questions
over the parties' method of arbitrator appointment–that grow out of an arbitrable dispute are
presumptively for an arbitrator to decide. Noble did not raise this specific argument below.
As a general rule, "'arguments not raised before the district court are waived and will not be
considered on appeal unless the party can demonstrate extraordinary circumstances.'" *French
v. Allstate Indem. Co.*, 637 F.3d 571, 582-83 (5th Cir. 2011) (quoting *AG Acceptance Corp. v.
Veigel*, 564 F.3d 695, 700 (5th Cir. 2009)). Noble contends that it did not waive the argument
because it maintained below that BP's Complaint should be dismissed because the ACA Rules
allow the parties to submit their dispute to the PCA. Although Noble may have so argued, it
now offers a new argument to this court for why the PCA should resolve the parties' dispute.
It has thus waived the argument. Noble also has failed to demonstrate extraordinary
circumstances which warrant our consideration of the argument in the light of its waiver.

No. 11-20547

granted BP's Motion for Final Order and did not err in denying Noble's Motion to Dismiss, to the extent Noble argued the district court lacked such authority.

B.

We now turn our attention to how the district court chose to exercise its authority under 9 U.S.C. § 5. We are guided in our analysis by two considerations. First, that arbitration agreements, like any other contract, should be enforced according to their terms. *AT&T Mobility,* 131 S. Ct. at 1748. Hence, it falls to the courts and arbitrators "to give effect to [ ] contractual limitations," and when so doing, "not lose sight of the purpose of the exercise: to give effect to the intent of the parties." *Stolt-Nielsen*, 130 S. Ct. at 1774-75. Second, Congress envisioned in the FAA very circumscribed judicial involvement in the arbitral process prior to the arbitration award. *Gulf Guar.*, 304 F.3d at 486. Limited judicial involvement advances the purpose of arbitration: to eschew the traditional judicial forum, with its procedural and evidentiary strictures, in favor of an efficient, speedy, informal resolution of a dispute. *See Forsythe Int'l, S.A. v. Gibbs Oil Co. of Texas*, 915 F.2d 1017, 1022 (5th Cir. 1990).

Despite the parties' clear agreement to arbitrate this particular dispute before three arbitrators, the district court ordered arbitration before five arbitrators: the three-party appointed arbitrators, and two neutral arbitrators to be chosen unanimously by the three party-appointed arbitrators, or, in the event of their disagreement, by the PCA. Noble argues the district court was authorized to "designate and appoint" the arbitrators affected by the lapse, subject to the proviso in § 5 that "unless otherwise provided in the agreement the arbitration shall be by a single arbitrator." 9 U.S.C. § 5. Because the parties' arbitration agreement provided for a three-member arbitral panel, Noble contends the district court violated § 5's plain language limiting the district court's appointment power–as well as the principle that the parties' arbitration agreement should be enforced according to its terms, *see Rent-A-Center*, 130 S.

Ct. at 2776–by ordering arbitration before five arbitrators. Noble maintains the district court had authority to appoint, at most, three arbitrators. Although it did not cross-appeal from the district court's order, Exxon agrees that § 5's plain language and Section 18.2 limited the district court here to appointment of three arbitrators. BP characterizes Noble's interpretation of § 5 as a "stretch," asserting that, even if valid, it is meaningless in this case because neither Section 18.2 nor the ACA Rules contain a workable method of selecting three arbitrators in a three-party dispute. In the absence of such a method, BP maintains that the district court had authority to impose on the parties any selection procedure it deemed appropriate.

Ensuring the proper designation of the arbitral panel is of the utmost importance; an improperly appointed arbitral panel puts the arbitration award at risk for vacatur. *See, e.g., Bulko*, 450 F.3d at 625. The goal of arbitration agreements is amicable resolution of disputes with results both parties must be willing to accept. Toward this end, as this appeal demonstrates, the parties to an arbitration agreement require a panel that consists of arbitrators chosen by the parties or chosen in a manner that is neutral and fair to all parties concerned. Consequently, in exercising its appointment authority under § 5, the district court must respect the intentions of the parties, as demonstrated in their arbitration agreement, while at the same time, pay heed to the principle that each party should be treated fairly, if not equally, in the appointment process.

We agree with Noble that the district court was limited to appointment of three arbitrators under that portion of 9 U.S.C. § 5 which states: a district court "shall designate and appoint an arbitrator or arbitrators or umpire, as the case may require, who shall act under the said agreement with the same force and effect as if he had been specifically named therein; and *unless otherwise provided in the agreement* the arbitration shall be by a single arbitrator." 9 U.S.C. § 5 (emphasis added). Although we have not had many occasions to interpret 9

U.S.C. § 5, our narrow reading of the statute's plain language is confirmed by our previous discussion in *Gulf Guaranty*, where we reasoned that, although § 5 gives the district court authority to select an arbitrator, its express terms do not authorize a court to remove an arbitrator from service. *Gulf Guar.* 304 F.3d at 490 ("[T]here is no authorization under the FAA's express terms for a [federal district] court to *remove* an arbitrator from service." (emphasis in original)). Hence, where the parties' agreement provides for three arbitrators, such as here, the district court is limited under § 5 to appointment of three arbitrators. By ordering the parties to proceed to arbitration before a five-member arbitral panel, the district court ignored § 5's plain language (that the district court "shall designate and appoint an arbitrator or arbitrators or umpire . . . ; and unless otherwise provided in the agreement the arbitration shall be by a single arbitrator"), thereby discarding the parties' agreement in Section 18.2 to arbitrate before three arbitrators and imposing a condition of arbitration to which none of the parties had agreed.

We thus disagree with BP's suggestion that the district court, in effect, had carte blanche to select any method of appointment and any number of arbitrators it considered appropriate.[10] The fact that the ACA Rules fail to

---

[10] BP argued to the district court, and now argues on appeal, that the secondary holdings of *In re Czarnikow-Rionda Co.*, 512 F. Supp. 1308 (S.D.N.Y. 1981), and *General Nav., Inc. v. Brovig*, No. 80 CIV. 6637, 1981 WL 22812 (S.D.N.Y. Feb. 13, 1981), support a five-member arbitral panel deciding a dispute among three parties. First, we note that the central holdings of these two cases–that district courts are allowed to consolidate arbitration proceedings absent consent of the parties–is no longer good law. *See Gov't of United Kingdom v. Boeing Co.*, 998 F.2d 68, 71 & n.1 (2d Cir. 1993) (recognizing that consolidation absent the parties' consent was no longer good law), *abrogation recognized by Stolt-Nielsen SA v. AnimalFeeds Intern. Corp.*, 548 F.3d 85, 100 (2d Cir. 2008), *reversed by Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 130 S. Ct. 1758, 1775-76 (2010). More to the point, we have never adopted the secondary holding of these cases–that a five-member arbitral panel should hear a dispute among three parties–and we do not today for the reasons discussed herein. Furthermore, these two cases pre-date significant development of the case law that emphasizes the importance of treating arbitration agreements like any other contract and enforcing them according to their terms. *Stolt-Nielsen*, 130 S. Ct. at 1773-74. Accordingly, we find the secondary holding of these two cases inapposite to the circumstances and legal posture

address the specific circumstances here does not mean the district court can ignore the parties' written arbitration agreement; instead, that failure, or lapse, provides the basis for judicial intervention under § 5. BP's argument, furthermore, overlooks the fact that the district court could have appointed three arbitrators itself, with or without party consultation, thereby adhering to the parties' agreement as well as resolving the parties' impasse. Although we appreciate that the district court's solution attempted to embrace the fairness of a tripartite panel when chosen by two parties, the parties' written arbitration agreement is the best evidence of what the parties intended. *See Univ. Reins. Corp. v. Allstate Ins. Co.*, 16 F.3d 125, 129 (7th Cir. 1994). Here, that agreement, embodied by Section 33 of the Assignment Agreement and Section 18.2 of the Drilling Agreement, in explicit and certain terms, provided for arbitration before three arbitrators. This provision should not command less deference from the district court simply because the parties' chosen process of selecting those three arbitrators has failed. *See* 9 U.S.C. § 2 (written arbitration provisions "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract"). Although strict adherence to three arbitrators presents a challenge in a three-party dispute in terms of selecting the arbitrators, "[b]y honoring the letter of the contract, we remain true to the [Federal] Arbitration Act as well as the parties' intent." *Univ. Reins. Corp.*, 16 F.3d at 129. Contrary to BP's intimation, the situation the parties found themselves in after Noble demanded arbitration was anything but unforeseen; the parties anticipated a dispute might arise out of the Assignment Agreement involving Noble and planned accordingly. No party suggests, furthermore, that the arbitration terms were anything less than the result of arms-length negotiations between sophisticated entities. The parties, in Section 33 of the

---

in which we find these parties in this case.

No. 11-20547

Assignment Agreement, were careful to provide for arbitral procedures for any dispute to which Noble was a party, and absent compelling circumstances, it is not our province to rewrite their agreement. *Southland Corp. v. Keating*, 465 U.S. 1, 7 (1984). Thus, for the district court "[t]o substitute [its] own notion of fairness in place of the explicit terms of [the parties'] agreement would deprive them of the benefit of their bargain just as surely as if [the district court] refused to enforce their decision to arbitrate." *Univ. Reins. Corp.*, 16 F.3d at 130. We therefore hold that the district court's order violated § 5's language limiting the number of arbitrators a district court may appoint to the number of arbitrators provided in the parties' agreement.

V.

In sum, we hold there was a lapse in the naming of arbitrators under the parties' arbitration agreement; thus, the district court properly exercised its jurisdiction under 9 U.S.C. § 5 to intervene in the arbitrator appointment process. The district court, however, violated the plain language of that statute. The statute limits the number of arbitrators that the district court may appoint in the event of a lapse to the number otherwise provided in the parties' agreement. Thus, by ordering the parties to proceed to arbitration before five arbitrators when their agreement specified three arbitrators, the district court exceeded its authority under the statute. The district court's order therefore is affirmed in part, and vacated in part.

On remand, the district court is directed to enter an order appointing three arbitrators. In the light of the parties' intent to arbitrate under the ACA Rules, and to appoint three arbitrators in accordance with those rules, we believe that the parties' intent, as expressed in their agreement to arbitrate, can best be embraced by the following procedure, which we direct the district court to consider, as is allowable and workable. Thus, the district court should consider entering an order: (1) requiring BP and Exxon, as the co-respondents to Noble's

24

arbitration demand, to appoint a second arbitrator, who would follow the agreed procedure for selecting a neutral member of the arbitral panel; (2) if BP and Exxon cannot agree on a second arbitrator by a certain date to be determined by the district court, the district court shall appoint the second arbitrator; and (3) if the two arbitrators cannot agree on the selection of a neutral member of the arbitral panel in accordance with the agreed procedure, the district court shall appoint the neutral arbitrator. We direct the district court to consider this procedure, but without taking away any discretion of the district court to modify, revise, supplement, or replace this suggested method of selecting the arbitrators or otherwise come to a resolution, so long as it is not inconsistent with this opinion. Of course, nothing in this opinion prohibits the parties from reaching an agreement between or among themselves upon which they can agree for the appointment of arbitrators to hear this dispute.

The order of the district court is AFFIRMED in part, VACATED in part, and the case is REMANDED.

AFFIRMED in part, VACATED in part, and REMANDED.