# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

February 3, 2021

Lyle W. Cayce
Clerk

No. 19-50220

Luis Orlando Rodriguez Solorzano,

*Plaintiff—Appellee*,

*versus*

Alejandro Mayorkas, *Secretary, U.S. Department of Homeland Security, In His Official Capacity as Secretary of Homeland Security of The United States*; Kenneth T. Cuccinelli, *Acting Director of U.S. Citizenship and Immigration Services*; Robert Cowan, *In His Official Capacity as Director of the National Benefits Center*; David Roark, *In His Official Capacity as Director of the Texas Service Center*; Margaret A. Hartnett, *In Her Official Capacity as Director of the El Paso Field Office*; United States of America,

*Defendants—Appellants*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 7:17-CV-249

Before Elrod, Southwick, and Haynes, *Circuit Judges*.

Jennifer Walker Elrod, *Circuit Judge*:*

---

* Judge Haynes concurs in the judgment only.

No. 19-50220

Luis Rodriguez Solorzano, a native of Honduras, challenged the United States Citizenship and Immigration Service's denial of his application to obtain lawful-permanent-resident status in district court. The government moved to dismiss Solorzano's lawsuit, but the district court denied the motion and remanded the case to the agency. The government now appeals the denial of its motion. Because the district court incorrectly interpreted and applied the relevant immigration statutes, we now REVERSE its decision and REMAND to the district court.

I.

Congress created Temporary Protected Status in 1990 as a form of humanitarian relief. *See* Immigration Act of 1990 § 302, 8 U.S.C. § 1254a. Under this statute, the Secretary of the Department of Homeland Security[1] may designate countries suffering from humanitarian crisis, such as an armed conflict or a natural disaster. 8 U.S.C. § 1254a(b). The Secretary may then grant TPS to aliens who are nationals of those designated countries and meet certain residential and registration requirements. *See id.* § 1254a(a)(1), (c). TPS recipients cannot be subjected to removal proceedings, and they are authorized to legally work in the United States while their TPS continues. *See id.* § 1254a(a)(1).

Temporary Protected Status was designed by Congress to be just that: a *temporary* protection for aliens whose own countries would be dangerous to return to. Initial designations can last from six to eighteen months, though the Secretary may extend a designation if conditions in the country continue to meet certain requirements. *See id.* § 1254a(b)(3). Approximately 411,000

---

[1] Although the statute references the Attorney General, authority to direct the TPS program has been transferred to the Secretary of the Department of Homeland Security. *See Mejia Rodriguez v. U.S. Dep't of Homeland Sec.*, 562 F.3d 1137, 1140 n.3 (11th Cir. 2009) (citing 8 U.S.C. § 1103(a); 6 U.S.C. § 271; and 8 C.F.R. § 244.2)).

No. 19-50220

foreign nationals from ten countries currently have TPS.[2]  Some individuals, like the plaintiff in this case, have maintained that status for more than twenty years.

TPS provides another other important benefit relevant to these proceedings: "For purposes of adjustment of status under section 1255 of this title" an alien with TPS "shall be considered as being in, and maintaining, lawful status as a nonimmigrant."  *Id.* § 1254a(f)(4).  Under 8 U.S.C. § 1255, an alien present in the United States may apply to have their immigration status adjusted to that of lawful permanent resident.  To successfully have his status adjusted, an alien must have been "inspected and admitted or paroled into the United States."  8 U.S.C. § 1255(a).

## II.

Luis Rodriguez Solorzano initially entered the United States without inspection and without admission or parole in 1997.  In 1999, the Attorney General designated Honduras for TPS purposes following Hurricane Mitch.  Designation of Honduras Under Temporary Protected Status, 64 Fed. Reg. 524–26 (Jan. 5, 1999).[3]  Solorzano then applied for and received TPS, which allowed him to remain and work in the United States legally.

---

[2] Jill H. Wilson, Cong. Rsch. Serv., RS20844, *Temporary Protected Status: Overview and Current Issues* 5 (2020).

[3] In May of 2018, the DHS Secretary announced that the TPS designation for Honduras would end on January 5, 2020.  However, after federal district courts in California and New York temporarily enjoined DHS from terminating several related TPS designations while litigation was ongoing, DHS has extended the termination date several times.  Most recently, it set the termination date to October 4, 2021.  *See* Continuation of Documentation for Beneficiaries of Temporary Protected Status Designations for El Salvador, Haiti, Nicaragua, Sudan, Honduras, and Nepal, 85 Fed. Reg. 79,208 (Dec. 9, 2020).

No. 19-50220

In 2014, Solorzano's wife, a U.S. citizen, filed a visa petition on his behalf. He concurrently applied to adjust his immigration status to lawful permanent resident based on that visa petition. The U.S. Citizenship and Immigration Service (USCIS) asked Solorzano to provide evidence of his lawful admission or parole. Solorzano submitted a brief arguing that, because he had TPS, he could adjust his status without that evidence. USCIS denied his petition because he had not been inspected and admitted or paroled into the United States at his initial entry.

Solorzano filed this lawsuit in the Western District of Texas seeking declaratory and injunctive relief.[4] He argued that the denial of his application was based on an erroneous interpretation of 8 U.S.C. §§ 1254a and 1255(a) and that his grant of TPS provided the admission required under § 1255(a). The government moved to have Solorzano's case dismissed. The district court denied the motion and remanded the matter to USCIS. The district court concluded that § 1254a(f)(4) "cure[s] the bars to adjustment of status under [§] 1255, including the requirement that a person be 'inspected and admitted or paroled.'" The government now appeals the denial of its motion to dismiss.

## III.

We have jurisdiction to hear this appeal under 28 U.S.C. § 1291. "Generally, the denial of a motion to dismiss is not a final decision under section 1291." *Newball v. Offshore Logistics Int'l*, 803 F.2d 821, 824 (5th Cir. 1986). However, the district court's order "end[ed] the litigation on the merits and [left] nothing for the court to do but execute the judgment,"

---

[4] The district court had original jurisdiction under 28 U.S.C. §§ 1331, 1346.

No. 19-50220

rendering its order a final decision on the merits and providing the basis for our jurisdiction. *Catlin v. United States*, 324 U.S. 229, 233 (1945).

We review "[d]eterminations of law, such as the district court's proper interpretation of a statute . . . *de novo.*" *BP Expl. Libya Ltd. v. ExxonMobil Libya Ltd.*, 689 F.3d 481, 490 (5th Cir. 2012).

IV.

The sole issue in this case is whether an alien who entered the United States without being "inspected and admitted or paroled" may still have his status adjusted to lawful permanent resident by virtue of obtaining TPS. Solorzano contends that he can because § 1254a(f)(4) says that, for purposes of status adjustment under § 1255, those with TPS are "considered as being in, and maintaining, lawful status as a nonimmigrant." 8 U.S.C. § 1254a(f)(4). According to him, this cures the bar to his status adjustment because it effectively places him in the same position that he would have been in had he entered with the required inspection and admission or parole. The government urges us to conclude that § 1254a(f)(4) does not cure the bar to Solorzano's status adjustment because it says nothing about the requirement that the individual be "inspected and admitted or paroled" upon entry. Instead, § 1254a(f)(4) "aims to bridge the gap created when an alien, who was admitted at a port of entry as a nonimmigrant, later applies for and accepts TPS, but then falls out of the status provided by such nonimmigrant admission."

Federal courts of appeal have split on this issue. The Sixth, Eighth and Ninth Circuits have held that § 1254a(f)(4) alleviates the requirement of inspection and admission for those with TPS. *See Flores v. U.S. Citizenship and Immigr. Servs.*, 718 F.3d 548, 552–53 (6th Cir. 2013); *Velasquez v. Barr*, 979 F.3d 572, 581 (8th Cir. 2020); *Ramirez v. Brown*, 852 F.3d 954, 958 (9th Cir. 2017). The Third and Eleventh Circuits have held that it does not. *See*

No. 19-50220

*Sanchez v. Sec'y U.S. Dep't of Homeland Sec.*, 967 F.3d 242, 245 (3d Cir. 2020), *cert. granted*, No. 20-315, 2021 WL 77237 (U.S. Jan. 8, 2021); *Serrano v. U.S. Att'y Gen.*, 655 F.3d 1260, 1265 (11th Cir. 2011). We recently agreed with the Third and Eleventh Circuits that "[t]hose with TPS who first entered the United States unlawfully are foreclosed from applying for adjustment of status as a matter of law." *Nolasco v. Crockett*, 978 F.3d 955, 959 (5th Cir. 2020). The Supreme Court will soon grapple with these issues in its review of the Third Circuit's decision in *Sanchez*. In the meantime, we offer our analysis of the issue in this case.

The text of the relevant statutory provisions confirms that TPS does not cure the bar to status adjustment in § 1255.[5] Section 1255(a) states that "the status of an alien who was inspected and admitted or paroled into the United States . . . may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence." 8 U.S.C. § 1255(a). Section 1254a(f)(4) states that, "[d]uring a period in which an alien is granted temporary protected status . . . for purposes of adjustment of status under section 1255 of this title and change of status under section 1258 of this title, the alien shall be considered as being in, and maintaining, lawful status as a nonimmigrant." *Id.* § 1254a(f)(4).

---

[5] After this appeal was filed, but before we decided *Nolasco*, USCIS issued a published decision in *Matter of H-G-G-*, 27 I. & N. Dec. 617, 641 (AAO 2019) holding that TPS does not constitute an inspection, admission, or parole of an alien. The government notes that, were we to find the relevant statute ambiguous, we should defer to the agency's interpretation under the familiar *Chevron* framework. *See Chevron, U.SA., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843–45 (1984). We agree that if the statute were ambiguous, we would be required to do just that. *See Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 157–58 (2013). However, because we find that the text unambiguously does not equate TPS with an admission under § 1255, we need not reach that step of the *Chevron* analysis. *See Chevron*, 467 U.S. at 843.

No. 19-50220

Solorzano and Amici[6] contend that because a TPS recipients is considered as "being in, and maintaining, lawful status as a nonimmigrant," § 1255(a)'s requirement that an alien be inspected and admitted is satisfied. *Id.* According to this argument, TPS requires that an alien be "admissible as an immigrant." *Id.* § 1254a(c)(1)(A)(iii). To determine whether an alien is "admissible," § 1254a uses the same statutory requirements that are used to determine general admissibility. *See id.* § 1254a(c)(2)(A). Moreover, as Amici explain in their brief, § 1254a(f)(4) says that TPS recipients are considered "as being in" a lawful non-immigrant status. Inspection and admission are required for someone to be in non-immigrant status. *See* 8 C.F.R. § 245.1(d)(1)(ii). Because TPS recipients necessarily meet the admissions requirements and must go through a process similar to admission in order to receive TPS, they are functionally admitted upon receipt of TPS.

This line of reasoning fails for several reasons. First, granting TPS does not constitute an admission under § 1255(a). It simply bestows a temporary status upon the recipient. We have previously explained that "[a]dmission and status are fundamentally distinct concepts. Admission is an occurrence, defined in wholly factual and procedural terms. . . . Status, by contrast, usually describes the type of permission to be present in the United States that an individual has." *Gomez v. Lynch*, 831 F.3d 652, 658 (5th Cir. 2016). That distinction is critical. As the Third Circuit recently stated, "[a]lthough appellants are correct that admission often accompanies a grant of lawful status, it does not follow that a grant of lawful status *is* an admission." *Sanchez*, 967 F.3d at 246. Possessing a status does not have the same legal effect as going through the process of admission. Receiving TPS does not equate to "a new entry." *Melendez v. McAleenan*, 928 F.3d 425, 429

---

[6] The American Immigration Council, Northwest Immigration Rights Project, and American Immigration Lawyers Association have filed a brief as *amici curiae* in this case.

(5th Cir. 2019). Nor does it retroactively cure the deficits in an alien's initial entry. *See id.* (stating that TPS "does not absolve" an alien from the effect of any prior disqualifying acts). It does not function as an admission under the statutory definition.

Second, granting TPS does not constitute a waiver of the admission requirement in § 1255. By its plain terms, § 1254a grants a status. Had Congress intended to use that status to waive the admissibility requirement for TPS recipients, it could have done so expressly. However, the text of § 1254a does not mention the admissibility requirement of § 1255. Instead, it references § 1255 generally. In contrast, § 1255 specifies that certain classes of immigrants are "deemed, for purposes of subsection (a), to have been paroled into the United States. 8 U.S.C. § 1255(h); *see also id.* § 1255(g). Rather than using similar language to describe TPS recipients, Congress declared that they "shall be considered as being in, and maintaining, lawful status as a nonimmigrant." *Id.* § 1254a(f)(4). The difference in legal description must have some legal effect. *See Immigr. and Naturalization Serv. v. Cardoza-Fonseca*, 480 U.S. 421, 432 (1987) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983))). While the one expressly waives or satisfies a requirement of admission respecting certain classes of aliens, the other does not.

Third, being "admissible" under § 1254a does not create an alternative method for satisfying the requirement that one be admitted under § 1255. One can be admissible without ever being admitted. And, as Solorzano recognizes, § 1254a does not require a TPS recipient to undergo the full admissions process. Instead, it waives certain grounds of inadmissibility on its face and permits the Secretary to "waive any other

provision of section 1182(a) . . . in the case of individual aliens for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest." *Id.* § 1254a(c)(2)(A). The process for receiving TPS is less exacting than the admissions process, and the Secretary has the power to make the TPS recipient's requirements even lower than those of an admitted individual. Despite their similarities, receiving TPS is not an equal alternative to admission.

Instead, as the government points out, TPS fixes a separate problem not already addressed by § 1255. Some aliens are inspected and admitted when they first enter the United States, are later granted TPS, and then fall out of the lawful status provided to them at entry. Without § 1254a(f)(4), those individuals would need to leave the country and re-enter before they could apply for an adjustment of status. Because of 1254a(f)(4), however, aliens whose lawful status would normally lapse while they have TPS can still take full advantage of § 1255(a) because they are considered as "being in, and maintaining" a lawful non-immigrant status. 8 U.S.C. § 1254a(f)(4). That is the situation § 1254a(f)(4) was designed to address. Thus, our reading of the statute does not render § 1254a(f)(4) superfluous in the context of § 1255.

This interpretation actually avoids rendering two other provisions of the INA superfluous, as the Third Circuit recently explained. Under § 1254a(h), Congress may pass special legislation that adjusts the status of aliens with TPS only by a supermajority of the Senate. "Reading § 1254a(f)(4) to place aliens effectively in lawful status and to satisfy § 1255's threshold requirement would pave a clear path to status adjustment for TPS recipients in derogation of § 1254a(h)(2)'s supermajority requirement." *Sanchez*, 967 F.3d at 247.

Moreover, "[i]f being considered in lawful nonimmigrant status was the same as being inspected and admitted or paroled, there would be no need

9

for § 1255 to list inspection and admission or parole as a threshold requirement in § 1255(a) and failure to maintain lawful status as a bar to eligibility for adjustment of status in § 1255(c)(2)." *Id.* By adopting the government's interpretation of § 1254a, we avoid rendering these sections of the statute mere surplusage.

The government's interpretation does not produce any other absurd results, either. Amici complain that the government's interpretation requires TPS recipients like Solorzano to leave the country and re-enter in order to become eligible for status adjustment. This would place such individuals in harm's way when they return to their own country, contravene Congressional intent to provide a safe haven for those individuals within the United States, and waste governmental resources.

This result is not absurd. Congress can choose its own policies. If Congress chose to extend benefits to individuals who enter the country lawfully while simultaneously denying those same benefits to individuals who entered unlawfully, it was within its right to do so. We do not review the soundness of the policy.

Moreover, Congress intended to provide only *temporary* relief to TPS recipients, not permanent protection. The purpose of the TPS program was not to facilitate fast passes to permanent residence in the United States. As the Ninth Circuit in *Ramirez* properly recognized, "[t]he TPS regime provides a limited, temporary form of relief for the period that conditions render an alien's return unsafe by creating a safe harbor and authorizing recipients to work in the United States to support themselves for the duration of their stay." *Ramirez*, 852 F.3d at 963. Congress created this form of *limited*, *temporary* relief to help protect individuals who would be unsafe returning to their own countries. It did not intend to provide permanent protection for such individuals. Initial designations last a *maximum* of

No. 19-50220

eighteen months and can be extended only if unfavorable conditions persist in the relevant country. *See* 8 U.S.C. § 1254a(b). Adopting the interpretation that Amici and Solorzano urge would erase the impermanent nature of the program by transforming it into a bridge to permanent residence rather than a temporary humanitarian aid program.

This argument appears to rest on the assumption that individuals will necessarily return to the very countries TPS is supposed to be protecting them from.[7] That simply is not true. TPS recipients have authorization to travel to any country and, with advanced notice to DHS and a proper application, they can obtain "advance parole." 8 C.F.R. § 244.15(a); *see also* 8 U.S.C. § 1254a(f)(3). Advance parole permits TPS recipients to leave the country and, upon their return, to satisfy the requirement that they be "inspected and . . . paroled" into the United States. 8 U.S.C. § 1255(a). Those individuals can travel abroad for any reason and go to any other country. They need not visit their own country at all.

Congress placed special importance on the act of being admitted or paroled into the United States. Requiring TPS recipients whose initial entry was deficient to try again is not absurd. Compliance with procedural requirements is required in many other aspects of our legal system.

V.

TPS does not excuse Solorzano from the requirement of being inspected and admitted into the United States. Because he was never lawfully admitted, he cannot now seek to adjust his status under § 1255(a).

---

[7] However, Amici know this is not true because they also argue that the availability of advanced parole makes the government's interpretation absurd.

No. 19-50220

We REVERSE the judgment of the district court and REMAND the case. On remand, the district court is instructed to dismiss Solorzano's amended complaint and grant judgment to the government.

No. 19-50220

HAYNES, *Circuit Judge*, concurring in the judgment only:

I concur in the judgment only.  We are bound by our court's precedent in *Nolasco v. Crockett*, 978 F.3d 955, 958 (5th Cir. 2020) regardless of whether we agree with it.  That, to me, is the beginning and end of the discussion. [1]

---

[1]  In any event, the Supreme Court has granted certiorari on this very issue, so there is no need for us to expand on it at this point. *See Sanchez v. Wolf*, No. 20-315, 2021 WL 77237 (Jan. 8, 2021) (mem.).  The question presented in *Sanchez* is: "Whether, under 8 U.S.C. § 1254a(f)(4), a grant of Temporary Protected Status authorizes eligible noncitizens to obtain lawful-permanent-resident status under 8 U.S.C. § 1255."  Cert. Pet., *Sanchez v. Wolf*, No. 20-315 (U.S. Sept. 8, 2020), 2020 WL 5501217, at *1.  Thus, this issue will soon be resolved, and we will be bound by that decision.